IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| TATE PARKER and | ) | |
| TAMARA PARKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:24-cv-79-RAH |
| | ) | [WO] |
| TRICAM INDUSTRIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This case concerns an extension ladder accident that resulted in serious injuries to Plaintiff Tate Parker. Through his expert witness, Parker claims the ladder was defective. The ladder manufacturer, Tricam Industries, Inc., disputes this assertion. Pending before the Court is Tricam's motion to exclude Parker's expert witness and for summary judgment. For the reasons below, Tricam's motions will be granted.

### BACKGROUND AND COURSE OF PROCEEDINGS

Tate Parker is a field insurance adjuster for Alfa Insurance Company. At the time of the accident at issue, his job duties included inspecting residential roofs that had endured storm damage.

On October 1, 2021, Parker purchased a Tricam Industries, Inc. Gorilla articulated extension ladder (Model GLMPXA-14) from Home Depot in Opelika, Alabama. The ladder was manufactured for Tricam in China in July 2020, transported to Alabama, and ultimately sold to Parker. Parker used the ladder on over 100 occasions without incident before the accident at issue.

1

The Tricam ladder can extend to 14 feet at full extension but fold and retract to an approximate 3.5-foot length for easy storage and carrying.  The extension ladder works by telescoping metal rails on both ends that lock into place through the engagement of rail lock rods.

On February 14, 2022, Parker was injured while using his Tricam ladder to access a residential roof for an insurance-related inspection.  According to Parker, he fully extended the ladder to its 14-foot length and locked the rail lock rods in place.  He then checked to ensure the rods were engaged and the rails secured and leaned the ladder against the roof edge. Afterward, Parker climbed the ladder. Toward the top, as he was beginning to step off the 3rd or 4th rung onto the roof, the upper ladder rails retracted, and the ladder collapsed.  Parker fell to the ground where he suffered significant injuries.  Parker identified the configuration of the ladder at the time of the accident as follows:





Parker v Tricam
ESi Matter: 102872

Figure 1. Approximate set-up of the subject ladder at the time of the subject incident

Page 8 of 60
Exhibit 2

2

Parker filed suit against Tricam on January 22, 2024, claiming the ladder was defectively manufactured and designed. He brought a claim under the Alabama Extended Manufacturers' Liability Doctrine (AELMD), and other claims for negligence, wantonness, breach of warranty of merchantability, and failure to warn; his wife brought a consortium claim.

During the discovery period, Parker identified an expert witness, as did Tricam, to speak to the issue of the cause of the ladder collapse. Parker's expert, Barton C. Prorok, Ph.D., is a materials engineer, metallurgist, and chair of the materials science and engineering department at Auburn University. He has no experience in ladder design and safety. Dr. Prorok opined that the ladder collapsed because one of the upper side rails was twisted, which allowed a rail lock rod to slip out of the locking hole and the ladder to retract with Parker on it. (Doc. 29-2 at 5–7.) According to Dr. Prorok, the "twisted rail" was a "manufacturing defect" that compromised the ladder's ability to safely bear weight. (*Id.* at 5–6.) Dr. Prorok also believed there was a "design defect" because the "short length of the rail lock rods" reduced the load carrying capacity of the ladder "especially when manufacturing variations or normal wear and tear occur." (*Id.* at 1.) The combination of the two caused Parker's accident.

As to the cause of the manufacturing defect itself, Dr. Prorok could only say that the "twist occurs near the area where the rail is mechanically deformed during manufacture to widen the ladder's base for added stability" and that this twist "went undetected by quality control." (*Id.* at 4–5.) As to the design defect, Dr. Prorok opined that the rail lock rods should have been longer. (*Id.* at 7–8.)

Tricam retained Erick H. Knox, Ph.D., P.E. as its expert. Dr. Knox is a licensed engineer with a focus in biomechanics, mechanical design, and accident reconstruction, and serves on American National Standards Institute (ANSI) committees on ladders and portable metal ladders. Through Dr. Knox, Tricam

offered a different explanation for the accident. (Doc. 26-3.) According to Dr. Knox, the accident occurred because the feet of the ladder slid outward and away from the house, thereby causing the ladder to collapse. (*Id.* at 59.) Dr. Knox also believed the twisting of the rail resulted from impact damage, possibly because of abuse or the accident itself. (*Id.* at 47–48.)

Dr. Knox was also critical of Dr. Prorok's opinions, particularly Dr. Prorok's lack of explanation of where or how a rail could twist during the manufacturing process and Dr. Prorok's failure to explain away other possible causes of the twisted rail. (*Id.* at 47–48.) As to the design defect regarding the length of the rail lock rods, Dr. Knox was critical in that Dr. Prorok provided no analysis for his opinion, nor did Dr. Prorok seek to duplicate his hypothesis as to what happened. (*Id.* at 47–49.) Dr. Knox also criticized Dr. Prorok for failing to address how the accident could have happened in the manner that he claims it did given the built-in redundancy afforded by the other rail lock, which was engaged with no twist in the rail. (*Id.* at 52.) Finally, he noted that the photographs taken of the ladder immediately post-accident did not support Dr. Prorok's theory about the accident's cause because the photographs showed that the bottom of the ladder was in a fully retracted position, not the top as Dr. Prorok hypothesized. (*Id.* at 56–58.)

After discovery closed, Tricam moved to exclude the expert testimony of Dr. Prorok, attacking his qualifications given his lack of experience in the ladder industry and attacking his methodology which Tricam argued was unreliable, unscientific, and unhelpful. Based on Parker's expert problems, Tricam also moved for summary judgment on all claims.[1]

## APPLICABLE LEGAL STANDARDS

Summary judgment is appropriate where the materials in the record show there is no genuine dispute as to any material fact and that the moving party is

---

[1] Parker concedes summary judgment as to the claims for failure to warn and wantonness.

entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its responsibility, the moving party must "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quotation marks omitted). This Court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984) (citation omitted).

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–88 (1986). To prevent summary judgment, a factual dispute must be both material and genuine. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is "material" if it has the potential of "affect[ing] the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (quoting *Liberty Lobby*, 477 U.S. at 248). And to raise a "genuine" dispute of material fact sufficient to preclude summary judgment, "the nonmoving party must point to enough evidence that a reasonable jur[or] could return a verdict" in his favor. *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (internal quotation marks omitted) (quoting *Furcron*, 843 F.3d at 1303).

The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. The "mere existence of a scintilla of evidence

in support of the [non-moving party]'s position" cannot defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 252.

## DISCUSSION

### A.     Motion to Exclude

Since Parker's claims largely depend on the admissibility of his expert's opinions, the admissibility of Dr. Prorok's opinions first will be addressed.

In determining the admissibility of expert testimony, the Court must "engage in a rigorous three-part inquiry," considering whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Rosenfeld v. Oceania Cruises, Inc*., 654 F.3d 1190, 1193 (11th Cir. 2011) (citation omitted, alteration in original) (quoting *United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc)); *United States v. Markovich*, 95 F.4th 1367, 1377 (11th Cir. 2024).  It is this Court's role to function as a gatekeeper to ensure that any and all expert testimony is both relevant and reliable.  It is not this Court's role to make ultimate conclusions on the persuasiveness of the proffered evidence.   Rather, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are generally the traditional and appropriate ways to attack shaky but admissible evidence*. Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

### i.     Methodology

An expert's methodology must be reliable enough to meet the second consideration. A court must assess "whether the reasoning or methodology underlying the [expert] testimony is scientifically valid and . . . whether that

reasoning or methodology properly can be applied to the facts in issue." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) (internal quotation marks and citation omitted). The Court "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Id*. (internal quotation marks and citation omitted); *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005) (explaining that an "expert's assurances that he has utilized generally accepted scientific methodology are insufficient" and that a court must do more than just take "the expert's word for it" (alteration, internal quotation marks, and citations omitted)).

There are four more factors that courts generally consider in the assessment of the expert's methodology:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential error rate of the technique; and (4) whether the technique is generally accepted in the scientific community.

*Adams v. Lab'y Corp. of Am.*, 760 F.3d 1322, 1327 (11th Cir. 2014) (citing Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010)). "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Frazier,* 387 F.3d at 1262 (citation omitted). Accordingly, "the trial judge [has] considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Regardless of the specific factors considered, "[p]roposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. And "[a]lthough testing is not always a prerequisite to reliability, an expert who conducts no testing must be prepared with a good explanation as to why his or her conclusion remained

reliable notwithstanding the absence of testing." *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 588–89 (N.D. Fla. 2009) (internal quotations and citation omitted).

Accordingly, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. On the other hand, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted).

### ii. Helpfulness

Federal Rule of Evidence 702 requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue." That is, it must be helpful. To be helpful, expert testimony must fit the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1298–99 (11th Cir. 2004); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). To do so, it must "logically advance[] a material aspect of the case" and "assist the trier of fact." *McDowell*, 392 F.3d at 1299 (internal quotation marks and citation omitted). "Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591 (internal quotation marks and citation omitted). Expert testimony that "offers nothing more than what lawyers for the parties can argue in closing arguments" generally will not assist the trier of fact and will be excluded. *Frazier*, 387 F.3d at 1262–63 (citation omitted). Just as an opinion is unreliable if it is based on an analytical leap that is too great between the underlying information and the proffered opinion, there is not a "fit" for purposes of the helpfulness prong when "a large analytical leap must be made between the facts and the opinion." *McDowell*, 392 F.3d at 1298–99 (citing *Joiner*, 522 U.S. at 146).

An "expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions." *Id*. at 1300.

Further, "[b]asing an expert opinion on facts not in evidence is not helpful to the trier of fact in understanding the evidence or determining a fact in issue." *Browder v. Gen. Motors Corp.*, 5 F. Supp. 2d 1267, 1283 (M.D. Ala. 1998) (citation and internal quotation marks omitted). Instead, testimony by an expert must be based on "facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co.,* 861 F.2d 655, 662 (11th Cir. 1988) (citations omitted). "Without an underlying basis of support, the expert's opinion is only one of many possible theories and interpretations of the facts at issue, and is no more or less helpful than the trier of fact's own reading of the evidence." *Browder*, 5 F. Supp. 2d at 1283.

### iii.    Dr. Prorok

While Tricam raises valid concerns with Dr. Prorok's qualifications to give opinions about ladder manufacturing and design due to Dr. Prorok's lack of experience in the ladder industry, the Court will assume without finding that Dr. Prorok is sufficiently qualified for purposes of the first consideration of the three-part inquiry. But the Court otherwise concludes that Dr. Prorok's opinions fail the second and third considerations–reliability and helpfulness.[2]

Dr. Prorok's opinions stem, first, from his observation that one of the rails on the subject ladder was twisted upon post-accident inspection. From there, he posits

---

[2] The Court shares Tricam's concerns about Dr. Prorok's qualifications to testify as an expert about ladder manufacturing and design, as other courts have held with similar experts who had no experience with ladders. *See, e.g.*, *Sittig v. Louisville Ladder Grp. LLC*, 136 F. Supp. 2d 610, 616–19 (W.D. La. 2001) ("[T]he experts' lack of experience and training in ladder design, renders the experts' opinions unreliable in this case."); *Fosberg v. Tricam Indus., Inc.*, No. 4:20-cv-126-A, 2021 WL 489060, at *2 (N.D. Tex. Feb. 10, 2021); *Phillips v. Tricam Indus., Inc.,* No. 1:19-cv-00184, 2020 WL 1816468, at *7–*9 (W.D. Mich. Feb. 20, 2020); *Edmons v. Home Depot, U.S.A., Inc.*, No. CIV-09-987, 2011 WL 127165, at *5–*7 (D. Or. Jan. 14, 2011); *Clark v. R.D. Werner Co.*, No. CIV A-99-1426, 2000 WL 666380, at *3–*5 (E.D. La. May 18, 2020).

there was a defect in the manufacturing process that caused an upper rail to twist and become distorted. He also believes there is a design defect in the length of the rail lock rods that allowed the rail lock rods to disengage because of the single twisted rail. The combination of the two defects, according to Dr. Prorok, caused both upper rails to slip, the upper ladder portion to retract, and the ladder to collapse and fall to the ground. To support these opinions, Dr. Prorok visually inspected the subject ladder, took measurements, purchased an exemplar ladder for comparison, inspected the site of the accident, and considered eye-witness accounts from Parker and the son of the homeowner.

Where, as Dr. Prorok does here, an expert has prepared an opinion solely for litigation, the Court applies the *Daubert* factors more rigorously and may weigh this fact heavily against the admissibility of the opinion. *Sumner v. Biomet, Inc*., 434 F. App'x 834, 842–43 (11th Cir. 2011). Applying this rigorous analysis, Dr. Prorok's opinions lack sufficient indicia of reliability required under *Daubert* and Rule 702. *See In re Deepwater Horizon BELO Cases*, 119 F.4th 937, 944–45 (11th Cir. 2024) ("Under Federal Rule of Evidence 702, expert evidence is admissible if the expert is qualified, the expert's methodology reaches a 'sufficiently reliable' conclusion under *Daubert* . . . ." (citations omitted)).

First, Dr. Prorok did not use a scientifically reliable methodology. He visually inspected Parker's ladder and an exemplar ladder and used a caliper to "quantify some dimensions." He provided no evidence that ladder manufacturers rely on visual inspections or caliper measurements to assess ladder defects. He did not explain how his measurements led to a scientifically reliable methodology. He never conducted tests to determine whether those measurements constituted a defect or unreasonable danger, or caused the ladder collapse. He did not cite peer-reviewed literature or an error rate to support his methodology, nor did he cite or consider any governing ladder standards, such as an ANSI standard. Additionally, Dr. Prorok

performed no ANSI/OSHA tests to reach his conclusions, even though such standards do exist for designing and testing ladders.

Further, Dr. Prorok provided no insight or information supporting his opinion that there was a manufacturing defect that caused the collapse. He states that the alleged manufacturing defect in the form of a "twisted rail" occurred "during the rail's mechanical deformation stage, where the base is widened to enhance stability." (Doc. 29-2 at 5.) But he failed to explain or confirm this belief. He did not describe the manufacturing process or what the "deformation stage" involved or how a rail could become twisted during that process. He also provided no information or opinions about why that twisting could not have occurred for other common sense reasons such as during the ladder's transit from China to the United States before sale, or during Parker's storage, and use of the ladder for months on over 100 occasions, or because of the accident itself. *See Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) ("[A]n expert must provide some explanation of why other potential causes were not the sole cause." (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999))).

In fact, Dr. Prorok never considered the possibility that the twist could have formed from Parker's pre-accident use or during Parker's accident. (Doc. 26-3 at 46–48.) Broadly saying that a rail twisted during the metal deformation stage is not enough, especially absent any discussion about other very reasonable explanations for the twist. And on this manufacturing-related point, neither Dr. Prorok nor Parker have presented any evidence of other ladders that exited the assembly line in China with similar manufacturing defects, whether that be in the form of QA analyses or reports, warranty claims or complaints, other lawsuits, etc. Thus, the only basis suggesting that Parker's ladder had a manufacturing defect is Dr. Prorok's *ipse dixit* opinion. *Joiner*, 522 U.S. at 146; *Graff v. Baja Marine*

*Corp.*, No. CIV.A. 06-CV-68, 2007 WL 6900363, at *5 (N.D. Ga. Dec. 21, 2007), *aff'd*, 310 F. App'x 298 (11th Cir. 2009).

And as to the design defect, Dr. Prorok opined that the length of the rail lock rods "is a design flaw that reduces load-carrying capacity, especially when manufacturing variations or normal wear and tear occur." (Doc. 29-2 at 1.) He does not explain what those "manufacturing variations" may be, or what impacts to the ladder there may be from "normal wear and tear." For all appearances, Dr. Prorok simply believes that the rail lock rods are too small to account for the twisted rail and fails to explain why this is a "defect" in design. And again, Dr. Prorok did not employ any particular methods or procedures to support his assertions.

Dr. Prorok also did not produce any literature, reports, or other documentation to support his contention that the accident occurred in the manner that he claims it did. And he tested none of his opinions. Indeed, he performed no testing to duplicate the conditions or manner in which he claims the collapse occurred.

More importantly, he failed to explain, and altogether ignored, the inconsistency and contradiction between his opinions about the mechanism of the accident and the actual photographs of the ladder taken almost immediately after the accident. The post-incident photographs show that the bottom half of the ladder—not the upper half—was in a retracted position. This conflicts with Dr. Prorok's opinion that the upper half retracted from a fully extended position:





**Figure 5. The post-incident position of the subject ladder**

Dr. Prorok does not explain this discrepancy. This inconsistency – a substantial one at that – shows that his opinions lack sufficient reliability.[3]  In short, Dr. Prorok's methodology amounts to no more than visual analyses and physical measurements that lack sufficient reliability. *See, e.g.*, *Borum v. Werner Co*., No. 5:11-cv-997, 2012 WL 2047678, at *12 (N.D. Ala. June 6, 2012) (excluding an opinion where the expert "fail[ed] to properly explain his methodology with respect to his theory that the ladder was defectively designed—more specifically, [the expert] neglect[ed] to account for industry standards, why additional bracing is recommended, the feasibility of his proposed alternative design, and testing for the alternative design") (internal quotation marks omitted).

On the methodology issue, the parties spend considerable effort in explaining the application of two local decisions—*Slay v. Keller Indus., Inc*., 823 So. 2d 623 (Ala. 2001), and *Borum v. Werner Co*., No. 5:11-cv-997, 2012 WL 2047678 (N.D. Ala. June 6, 2012) − regarding similar expert witness issues involving ladder failures.  These decisions are somewhat helpful.  In *Slay,* the Alabama Supreme Court affirmed the trial court's exclusion of the plaintiff's ladder expert because mere assertions of belief, without any supporting research, testing, or experiments, could not qualify as proper expert scientific testimony.  823 So. 2d at 626 (noting that Alabama still follows the "general-acceptance" test for expert witnesses enunciated in *Frye* but ultimately analyzing the expert's admissibility under both *Daubert* and *Frye).*

In *Borum*, the Northern District of Alabama, discussing *Slay*, excluded a ladder expert under *Daubert* because the expert "merely state[d] that the [product]'s

---

[3] At the summary judgment hearing, the Court inquired of Parker's counsel as to the discrepancy between Dr. Prorok's opinion for the cause of the accident (i.e., that the upper section had retracted because the upper lock rods disengaged because of the upper twisted rail) against the photograph which showed the upper section as being fully extended.  Counsel stated that the upper section must have recoiled into position.  Other than this statement by counsel, Dr. Prorok did not explain this observation.

failure could have been prevented by employing a [particular reasonable alternative design]," without providing any more analysis on his methodology. *Werner Co.*, 2012 WL 2047678, at \*13–\*14 (internal quotation marks omitted). The district court reasoned that "[m]ere assertions of belief, without any supporting research, testing, or experiments, cannot qualify as proper expert scientific testimony." *Id.* at \*13. The district court also found that even if the proposed alternative design may have prevented the accident, the expert's failure to provide a reliable methodology supporting this conclusion meant that the opinion must be excluded. *Id.* at \*14. Parker's expert here, Dr. Prorok, suffers from many of the same infirmities.

Finally, Federal Rule of Evidence 702 requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue." Rule 703, in turn, mandates that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." The rules do not "provide for an expert opinion based on sheer speculation over the circumstances surrounding the issue upon which he or she purports to provide expert testimony." *Browder*, 5 F. Supp. 2d at 1283. "Basing an expert opinion on facts not in evidence is not helpful to the trier of fact in understanding the evidence or determining a fact in issue." *Id.* (citation and internal quotation marks omitted). Instead, testimony by an expert must be based on "facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988) (citations omitted). "Without an underlying basis of support, the 'expert's' opinion is only one of many possible theories and interpretations of the facts at issue, and is no more or less helpful than the trier of fact's own reading of the evidence." *Browder*, 5 F. Supp. 2d at 1283.

Multiple portions of Dr. Prorok's opinions are not based on facts in evidence, and thus would not assist the trier of fact. The most glaring example is his position that the twisting was caused during the metal deformation stage of the manufacturing

15

process. There is no evidence about the metal deformation process. Nor is there any evidence explaining how the upper part of the ladder, post-accident, was observed to be in the fully extended position while the bottom portion was fully retracted if the accident occurred in the manner that Dr. Prorok claims it did. Dr. Prorok does not address this.[4]

For all these reasons, Dr. Prorok's expert opinion will be excluded. To say that the accident occurred in the manner that it did and for there to be a vaguely described manufacturing defect that caused the rail to twist, to the exclusion of various other logical reasons for the twist, lacks sufficient evidentiary support and reliability and would not aid the trier of fact. Without more, the Court may not blindly accept Dr. Prorok's conclusions.

### B.    Summary Judgment Motion

Parker's Complaint brings claims for negligence, a violation of the AEMLD, breach of warranty, and a consortium claim by his wife that depends on the survival of one or more of Parker's tort claims. Tricam contends that all these claims fail as a matter of law without admissible expert opinion testimony to support Parker's defect and causation theories. The Court agrees.

To state a claim under the AEMLD for a design and manufacturing defect, a plaintiff must prove, among other things, that (1) he suffered injury proximately caused by a product that was in a defective and unreasonably dangerous condition and (2) the product reached the plaintiff without substantial change in condition from when it was sold. *See Casrell v. Altec Indus., Inc.*, 335 So. 2d 128, 130–33 (Ala. 1976). To that end, "'ordinarily, expert testimony is required' in AEMLD cases" to prove that the product is defective and that the defective condition of the product

---

[4] Tricam offers the explanation that Parker only extended the ladder's top half, left the bottom half retracted, and then leaned the ladder against the roof edge and that the accident occurred when the feet of the ladder slid out from underneath the ladder. According to Tricam, this is common in ladder accidents.

caused the product to fail and injure the plaintiff, especially when the product is complex and technical. *Rudd v. Gen. Motors Corp.*, 127 F. Supp. 2d 1330, 1338 (M.D. Ala. 2001) (alteration and citation omitted).   Without proof of a defect, an AEMLD claim fails. *See, e.g.*, *Jordan v. Gen. Motors Corp.*, 581 So. 2d 835, 836–37 (Ala. 1991) (citation omitted) (holding that '"[w]ithout evidence to support the conclusion that the product was defective and/or unreasonably dangerous when it left the hands of the seller, the [plaintiff's] burden is not sustained."); *Tanksley v. ProSoft Automation, Inc.*, 982 So. 2d 1046, 1051 (Ala. 2007) ("Proof of an accident and injury is not in itself sufficient to establish liability under the AELMD; a defect in the product must be affirmatively shown." (quoting *Townsend v. Gen. Motors Corp.*, 642 So. 2d 411, 415 (Ala.1994))); *Britt v. Chrysler Corp.*, 699 So. 2d 179, 181–83 (Ala. Civ. App. 1997) (requiring expert testimony to prove the existence of a defect in an air bag system); *Brooks v. Colonial Chevrolet-Buick, Inc.*, 579 So. 2d 1328, 1332–33 (Ala. 1991); *Verchot v. Gen. Motors Corp.*, 812 So. 2d 296, 301–03 (Ala. 2001); *Townsend*, 642 So. 2d at 415–18 (requiring expert testimony to prove the existence of a defect in a vehicle's brake system); *Beam v. McNeilus Truck & Mfg., Inc.*, 697 F. Supp. 2d 1267, 1278 (N.D. Ala. 2010) ("Because plaintiff has presented no admissible evidence demonstrating a design defect or causation, plaintiff has not established a *prima facie* case under the AEMLD.").

Likewise, where the same defect and causation theories underlie negligence and warranty claims (assuming they are not subsumed by the AEMLD), those claims also require proof of a defect. *Connally v. Sears, Roebuck & Co.*, 86 F. Supp. 2d 1133, 1136–38 (S.D. Ala. 1999); *Sears, Roebuck & Co. v. Haven Hills Farm, Inc.*, 395 So. 2d 991, 995–96 (Ala. 1981).   For this reason, if the AEMLD design and manufacturing defect claim fails, so do Parker's negligence and warranty claims. *See Connally*, 86 F. Supp. 2d at 1138; *Pearl v. Mad Engine, Inc.*, No. 7:12-cv-2850, 2015 WL 5179517, at *3–*7 (N.D. Ala. Sept. 4, 2015) (holding the plaintiffs'

warranty claim failed for the same reason as their AEMLD claim—failure to demonstrate that the product was defective); *McCreless v. Glob. Upholstery Co.*, 500 F. Supp. 2d 1350, 1358–59 (N.D. Ala. 2007) (determining that an AEMLD claim failed for want of expert testimony on defect and causation, and granting summary judgment on negligence and wantonness theories "[b]ecause defective design or manufacture and proximate cause are essential elements of all theories being pursued . . . and because . . . [plaintiff] has no evidence to support these essential elements").

Parker does not dispute that expert testimony is a necessary ingredient of his case. Indeed, under the AEMLD and similarly focused tort claims based on defective products, Alabama courts consistently require expert testimony to prove a defect. Lay juries lack the knowledge, training, and experience necessary to determine the existence of a defect in a technical product. There is no question that the Tricam ladder is sufficiently complex and technical in nature such that a lay juror could not, without any expert testimony, infer that a defective condition of the product caused the product's failure and caused the resulting injury to Parker. *Cooper v. Toshiba Home Tech. Corp.*, 76 F. Supp. 2d 1269, 1276–78 (M.D. Ala. 1999). But without Dr. Prorok's opinions, Parker cannot produce admissible expert testimony to support the essential elements of his defect-based claims. This failure ends the Court's inquiry at summary judgment. Put another way, Tricam is due summary judgment because defective design or manufacture and proximate causation are essential elements of all of Parker's claims, and he has failed to present sufficient evidence of both.

## CONCLUSION

With insufficient evidence of a defect that proximately caused the ladder's failure, Tricam's summary judgment motions (doc. 26; doc. 27) are due to be **GRANTED**. A separate judgment will be issued.

**DONE,** on this the 1st day of May 2025.

R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE